May it please the Court, I'd like to begin, if I could, by addressing the questions that Judge Higginbotham and Judge Graves addressed to my colleagues from Louisiana and Mississippi, starting with the question of why Texas' marriage laws would allow infertile opposite-sex couples to marry, and how can the laws be constitutional by defending them on the ground that they promote procreation. There are many answers to that objection, each of which is decisive and none of which the plaintiffs have been able to answer. The first, as Judge Smith rightly points out, is that rational basis review does not require a perfect fit between means and ends. The fact that the distinction drawn by the legislature is imperfect does not make it irrational. But the second point is more important. There are two different interests in procreation that are advanced by Texas' marriage laws, each of which is explained and distinguished in our briefs. The first interest in procreation is the interest in encouraging couples to produce new offspring, and the marriage laws are rationally related to that interest because opposite-sex couples are far more likely than same-sex couples to produce children. But there's a second procreation interest, which is distinct from the first, and that is the state's interest in discouraging unplanned out-of-wedlock births that impose negative externalities on society and burden taxpayers by requiring them to pick up the costs of supporting children that should be born by their natural fathers. Opposite-sex marriage advances the state's interest in reducing unplanned out-of-wedlock births, and same-sex marriage does not. Judge Higginbotham noted in the earlier case that Judge Posner was unimpressed with this argument. But with all respect to Judge Posner, he was not applying rational basis review. Judge Posner did not take issue with the state's empirical claim that same-sex marriage will do nothing to advance the state's interest in reducing unplanned out-of-wedlock births. He simply thought that that was not a valid justification. He thought it was unjust to withhold the benefits of marriage from same-sex couples on account of that distinction. But that's where Judge Posner crossed the line from applying rational basis review into second-guessing the legislature's policy judgment. And there's no disagreement between the plaintiffs and the state over these empirical questions. Everyone acknowledges that same-sex couples are biologically incapable of producing children. And everyone therefore acknowledges that opposite-sex marriage will advance these two interests in procreation to a greater degree than same-sex marriage will. And this leads into another question raised by Judge Graves. Judge Graves asked one of my colleagues... But it's not that they're going to advance it in some independent way. The question is, if they co-exist, where are we? If they co-exist, the state is extending a subsidy of marriage to relationships that are less likely to advance the state's interest than opposite-sex marriage will. And that's what establishes a rational basis for our law. Judge Graves was asking one of the lawyers from the other states, what harm will arise from recognizing same-sex marriage? Or what benefit will the state gain from withholding the recognition of same-sex marriage? With all respect, that's not the right question to ask on rational basis review. Consider subsidies for school lunches. The state will withhold them from... Yes? I'm following what you're saying, because I think it's important. Are you saying that if you allow same-sex marriage, that the legislature is justified in concluding that that will increase the number of children born out of wedlock? No, that's not our contention at all. It's a different argument. What we're saying is that marriage is a subsidy, and the state is entitled to reserve that subsidy for the relationships that are more likely to advance the state's interest in reducing unplanned out-of-wedlock births. And withholding that subsidy from marriages that will do nothing to advance the state's interest in reducing unplanned out-of-wedlock births. This is no different from a state deciding that subsidies for school lunches should be... So is that a marriage is a subsidy, and there is no right to marry? It's just a subsidy. We're not saying there's not a right. The state can either confer or withhold. It is a subsidy, it is a benefit, and it takes different forms in different states. For example, tax laws may vary from state to state as far as what the specific benefits of marriage will be. But it is a benefit provided... I'm going to miss you. I'm sorry. So what you said is there is no right to marry. No, we're not denying that there's a right to marry. The Supreme Court has held that there is a fundamental right to opposite-sex marriage, which it held in Loving. But what that means, what marriage means from the state's perspective, is that there will be a package of benefits conferred on the married couple, including tax benefits, a spousal testimonial privilege, and those will vary from state to state. The state gets to decide exactly what the benefits are. But a state... So there are benefits that flow from the right to marry. Yes, that's correct. And the state can decide when to confer or withhold the benefits. Well, it has to be a rational distinction. But that doesn't justify denial altogether of the right, does it? Well, it will justify it if there's a rational reason for withholding the subsidy. So Your Honor was asking one of my colleagues, what does the state gain from withholding the right of same-sex marriage from same-sex couples? And with all respect, on a rational basis, that's not the proper question to ask. All we have to show to prevail on a rational basis is that conferring these benefits on opposite-sex couples will advance some state interest to a greater degree than conferring these rights on same-sex couples. Here's... By the same... You're not going to discontinue the benefits that are now accorded to married couples? I'm sorry, opposite-sex... I mean, heterosexual married couples. Okay, that's right. That's going to continue. And the question is, if you then also give the new group the same benefits, that that will, in turn, have this impact upon the people. That's the way you have to frame the question. We're not contending, and we don't need to argue, that the recognition of same-sex marriage will be harmful. That is not what we need to show to prevail on a rational basis. All we have to show is that same-sex marriage will not advance the state's interests to the same extent that opposite-sex marriage will. And that proposition is undeniable when it comes to the state's interest in procreation. The plaintiffs have pointed out in their brief, for example, that same-sex female couples might be able to produce children through assisted reproductive technologies. And they're correct... They're unlikely to procreate, so we don't withhold those benefits. They're less likely to procreate... You're not arguing that that's going to have any effect upon marriage itself as it goes forward. Well, we're not arguing that, and we don't need to show that. You don't want to subsidize something that doesn't further this interest. That's exactly right. That's the argument, and that is an acceptable argument to make on rational basis review. So if a state legislature decides... Be real clear about it. Yes. If the state legislature decides, for example, that it will subsidize school lunches only for children of poor parents and withhold those subsidies from children of middle-class parents or wealthy parents, the state's not required to show that withholding that subsidy will advance the state's interest in nutrition. In fact, it would probably advance the state's interest in nutrition to subsidize school lunches for everyone. But the state's deciding to reserve this subsidy to the group of people who will most likely benefit from the subsidy and for whom the state's interest in nutrition is more likely to be advanced and advanced to a greater extent. It's the same type of rational distinction that's being made here with the state's marriage laws, and the plaintiffs in the district court throughout this litigation have mischaracterized the nature of rational basis review. It's not our burden to show... I'm going to follow your analogy because the lunch analogy sounds like I'm not denying you the right to eat lunch. I'm just telling you I'm not going to pay for it. You're not going to subsidize it. You're not going to confer a government benefit. But in this instance, you're saying not only am I not going to confer any benefits in marriage, I'm going to deny you the right to marry. The state's not denying their right to live together. It's not denying their right to change their names or hold a wedding ceremony. It's simply... It just can't get married. They won't get government recognition or subsidies of that relationship and have it treated as a marriage, and that's the same thing as the state deciding that it will withhold benefits or recognition or subsidies in other particular contexts. So it's not a situation like Loving where the plaintiffs actually were thrown in jail for living together as husband and wife, and that is actually an affirmative imposition on liberty. This is just a withholding of government recognition and subsidies, and the government can decide to reserve subsidies for the behaviors that are more likely to promote the benefits that the government is seeking to promote, and that's all that's needed on a rational basis. So for the plaintiffs to win, they need to get to strict scrutiny somehow, and there are two ways to do that. One is the fundamental right route under substantivity process, and the other is to show that sexual orientation is somehow a suspect class entitled to strict scrutiny. And... Conserve resources. That's the state's objective. Conserve resources or simply to say that we want to confer and reserve the benefits for the behaviors that are more likely to generate the interest in procreation that the state is seeking to promote. In an area that's traditionally reserved to the states. That too. Yes, of course. The states have always held the prerogative to impose other limitations on who can get married and what the definition of marriage will be. Judge Higginbotham asked some questions to the Louisiana attorney about immutability and other questions about whether strict scrutiny should apply under equal protection analysis. We should be clear. We are not conceding that sexual orientation is immutable, and the Paul McHugh amicus brief in our case and our support cites the relevant scientific authorities on this question. There is a dispute in the scientific literature. There is? Yes, there is. I thought that every medical association since 1974 had dropped that sort of listing as a disease. That's different. That's a different question. Whether it's... That's just one piece of it. Whether it's immutable... Is the state maintaining that it is not immutable? Our contention is that there is a scientific debate on the question. We are not taking a position on that scientific debate because it's a complicated one and it's outside the technical expertise of the state lawyers. Is that a basis for the state's action or not? Well, it's a basis to distinguish race and sex. No serious person contends that race is not an immutable... I'm arguing this is an abstract proposition. The question here is why sex is doing what it's doing. And are they doing it because they think that this is an illness that can be cured? No, of course not. That's not the reason. The reason is what I explained earlier, Judge Higginbotham. What are you arguing then? We're arguing that strict scrutiny should not apply. Earlier I was explaining why rational basis review is easily satisfied, because the state's distinction can be defended as a way of reserving the benefits of marriage for the opposite sex relationships that are more likely than the same sex relationships to advance the state's interest in procreation. But to win, we have to show that rational basis is the proper standard. And to make that claim, we have to show why strict scrutiny should not apply. And the immutability question is one of the factors that the Supreme Court considers. You are arguing that it's not an immutable characteristic. You're trying to make the legal argument that whatever legal consequences in terms of level of scrutiny that flow from being immutable are not available. We're arguing rational basis applies. And the plaintiffs have said it's immutable. The scientific literature, there are articles that go both ways on this question. All the authorities are cited in the Paul McHugh amicus brief, and none of them are acknowledged by the courts that have said, without surveying the literature, that sexual orientation is an immutable characteristic. Now, there's another question Your Honor asked, which is, does sexual orientation have any Again, we respectfully suggest that's not the proper question when challenging a state's marriage laws, because sexual orientation is surely relevant to the benefits and subsidies that the state is providing in marriage, and it's surely relevant to the purpose of why the state provides those benefits and subsidies in the first place. It is relevant directly to the purpose, and the question is whether it's really a product of animus, or in fact, or not. Well, the reason it can't be a product of animus is because sexual orientation is relevant to the state's interest in procreation. Someone who wants to marry a person of the same sex is not going to be likely to produce new offspring. And recognizing a marriage between persons of the same sex is not going to in any way advance the state's interest in reducing unplanned out-of-wedlock births. That's the rational basis for the state law that refutes any accusation of animus. The state's proceeding from a view of marriage that the plaintiffs do not share. The plaintiffs believe the state's laws are irrational because they view the institution of marriage as existing only to celebrate the mutual love and commitment of two people. The state's marriage laws reflect a different view. The celebration of love component is important, but it's secondary to the interest in generating positive externalities and positive benefits for society in the form of encouraging the creation of new offspring and in reducing the incidence of unplanned out-of-wedlock births that put a strain on the state's fest. When marriage is viewed, it does that by subsidizing and encouraging opposite-sex couples to get married. But you're going to continue to do that. Of course, yes. You say it's been very effective. That's not going to stop. That's right. The question is, if you also extend that to someone else, the fact that you also extend the subsidy to these other people, that will in turn end what the benefits are, affect adversely the benefits that you're getting by the subsidy. No, we're not arguing that at all. Of course you are. We're not asserting that recognizing same-sex marriage would undermine the state's interest in procreation. We're saying that it would not advance the state's interest in procreation to the same extent. And that point is undisputed between the parties. The plaintiffs do not contend that same-sex couples are as likely as opposite-sex couples to produce new offspring. And same-sex couples aren't biologically capable of doing that. I was going to say, except this point that somehow or another, if you extend this benefit to same-sex couples, we're going to have a lot more illegitimate children over here because people aren't going to get married. That's not our argument. That is not our argument, no. Here's our argument. Recognizing marriage between opposite-sex couples reduces the incidence of unplanned out-of-wedlock births because it channels procreative sexual intercourse into marriage. Recognizing same-sex marriage does not advance that state interest. If we didn't have opposite-sex marriage, we would have... It doesn't hurt it. It doesn't hurt it. That's correct. But it doesn't advance it either. And on rational basis review, that's enough. If the court were applying strict... There's no consequence then other than the fact that you saved state resources. I'm not saying that it would have no other consequence. We've eliminated all benefits. Your reason for the state doing this is that they just do not want to support this particular process here because it's not advancing the goal it wants to advance. And it's not going to harm anything else. In fact, we just don't want to spend the money that way. That's enough to pass rational basis review. Now, Judge Hickman... It doesn't, but I'm trying to understand what your argument is. Is that it? That's one of the arguments, and that's enough to pass rational basis review. Now, Your Honor was asking what will happen if same-sex marriage is recognized. It's too early to answer that question. Same-sex marriage hasn't been around long enough for anyone to know with any certainty what the ultimate effects will be. What's the magic number? 20? I don't know what the magic number is. Five? I think that's a decision for the legislature, Judge Graves. The legislature has the right to decide when it feels comfortable making such a dramatic change to a social institution that has existed for millennia and is essential to the survival of the human race. The people of Texas have every right to proceed with caution, and they can decide to wait and see how this social experiment plays out in the countries and states that have recognized same-sex marriage. It's certainly rational to conclude on rational basis review that it's too early for Texas to join the fray when same-sex marriage has existed only for a few years, no more than 15 years anywhere in the world. Do you think passing a ban is evidence of a wait-and-see approach? Of course, because the ban can always be repealed. This is a democratic decision made by democratically accountable officials who can always change their mind later once the evidence is in. What is the concern or the fear that we should wait to see if it's real? Here's the concern that I think undergirds much of the support for traditional marriage laws. As we mentioned in our brief, there are two ways to conceive of the institution of marriage. One way is to view it primarily or almost exclusively as a celebration of love and commitment between two people. There's nothing wrong with that view. Many people hold it. Another way to view marriage is to see the purpose primarily to generate positive consequences and externalities for society by encouraging the creation of new children and, of course, by preventing the incidence of unplanned out-of-wedlock births. Those who oppose same-sex marriage are animated by a concern that it will reinforce the notion that marriage exists not only primarily but perhaps almost exclusively as an institution to celebrate the love and commitment of two people. And in doing that, it could undermine the idea that marriage is existing to encourage procreation and to encourage the creation of new offspring. It's a theoretical fear. It's a hypothetical concern, but it's certainly one that is rational, and it's also rational for the state to decide. It wants to see how the experiment plays out in Western Europe and in Massachusetts and New England and other states where it's been made legal over the past 10 or 15 years. Western Europe, for example, has a fertility crisis. So your point is we don't have to agree with the rationale to uphold it if we determine that there is such a rationale. That's right, of course. I mean, all one has to ask is whether it's possible to imagine a rational reason for the state to proceed with caution when changing the definition of the institution of marriage. And it could very well be that same-sex marriage not only will be harmless, it could very well be beneficial. And there are many respectable arguments that have been made. For example, people have argued that same-sex marriage will increase household wealth. They've argued that it will provide a good child-rearing environment for the children of same-sex couples. These are all respectable policy arguments that the legislature should consider in deciding whether to make same-sex marriage legal. But they're not a basis on which a federal court can declare the people of Texas irrational for deciding to adopt a view of marriage that is procreation-centered and wanting to wait and see how same-sex marriage will play out in other jurisdictions. I guess it's your assertion that there's some kind of declaration that the people of Texas are irrational, which was made by the lower court. Rational basis review just says you've got to show some rational relationship between the law and the purposes articulated for the passage of that law. I'm just not so sure I agree that to find a law unconstitutional is tantamount to finding that the people who passed it are irrational. Well, I think to declare it unconstitutional on rational basis review would mean that there's no conceivable rationale that could be imagined that could support the legislature's decision. That's not the same as declaring that the people— Maybe not. Maybe not. But there certainly are thoughtful defenses of same-sex marriage that have been offered by scholars and others, and— There are limits to the hypothesizing of—in its doctrine. Do you agree with that? There are limits in terms of what a state can do on— Exactly. We have said in other contexts, even in the most deferential areas of economic regulation, that it can't be fantasy. Of course. It has to be something—it—admittedly, it's extraordinarily deferential on a rational basis, yes, and it is whatever the lawyers and the—at any stage along that could dream up, but it still has to be footed in some basis that is fantasy. My question to you is that at what point does this hypothesis fade into animus? To what extent is this fear or concern born of a hostility to homosexuality and same-sex marriage as such? And when is it—in other words, that's the—I think a fair question, and I'm not—don't question my views about that. I just think that that is—dances very close to pushing the animus to one side, which Justice Kennedy certainly was not doing in his earlier writings. We certainly don't think it's accurate or fair to suggest that the supporters of traditional marriage laws are acting out of animus. They're acting out of a deeply held belief of what the purposes of the institution of marriage are for. And this is no different from disagreements in other areas of law. Some people think that antitrust law should be concerned exclusively with economic efficiency and protecting consumers. That's the Chicago School of Antitrust. And other people think that antitrust law should protect small dealers and worthy men from competition. People don't think that you're irrational if you belong to the Chicago School of Antitrust versus the Rufus Peckham opinion that was talking about small dealers and worthy men. It's just two different ways of thinking about what— What's your definition of animus? Animus would be irrational prejudice or hatred. And there's— Rather than rational prejudice. Well, this can't be— What's that? As opposed to rational, yeah. The reason these laws are not born of animus is because they're rooted in scientific fact. They're rooted in the biological reality that same-sex unions cannot produce new offspring. That's why no society— But fear of the unknown, a lack of understanding of people who are different, and insensitivity to the preferences of people who are different, those are not things that you would equate with animus. Well, we certainly wouldn't offer those as a rational basis for the law, and we're not offering them as a rational basis for this law. And we respectfully suggest that's an unfair caricature of the supporters of traditional marriage laws. They're not acting out of irrational fear of the unknown. My question was whether or not those are the kinds of things that would fit a definition of animus. That's all I ask. Animus means hatred. I mean, if you look up the word animus in the dictionary, that's— The answer to my question is no, those aren't— I wouldn't say that—I might say those are irrational under rational basis review, and I certainly wouldn't try to defend a state law simply by saying we enacted this because we fear the unknown. But I wouldn't put those in the animus category. Animus is something worse than that. Animus is hatred, prejudice, bigotry, those sorts of things. And it's been all too common for animus to become used as a label for impugning the motives or defaming the character of those who may disagree with a certain view that's fashionable and certain. It's not confined to the malignant animus of things like racism of a sort, just hardcore racism and bigotry, as you say. It is the uncertainty that is the fear of this strange animal that's new to them, et cetera. It's a softer standard than I think I hear being articulated. Even if it were, Judge Higginbotham, that's not what's going on here. And it's possible to imagine a rational basis for these laws. I'm not suggesting there's prejudice or absence. I'm just trying to keep an eye on the metric for animus. It is a loose term. I know, but you were characterizing it in little ways that I would not agree with on the law. It's our view the term animus should be construed narrowly because it is such a loose term, and it can be used in a very conclusory way simply for impugning people's motives or defaming their character. I see my time has expired. Unless there are further questions, I'll save time for rebuttal. Thank you. Lane. May it please the Court. Neil Lane of Aiken, Gumstrasse, Hirenfeld on behalf of the plaintiffs. I represent four individuals who wish to be married in Texas and have their marriage recognized in Texas but they're denied that right because the laws of Texas have created a caste system abhorrent to the core values of the 14th Amendment. My clients are denied those rights, privileges, and ultimately wealth enjoyed by other citizens with whom they work, live, and worship side by side. As the Court knows, my client, Nicole, is expecting a child in March. She and Cleo were married in Massachusetts, and they're expecting that child as matter stand. When that child is born, on that birth certificate, there will be Nicole's name, but where Cleo's name should appear, there will be a blank as it was with their first child. And God forbid if Mark, one of my other clients, dies tomorrow, when he dies, where there should be a surviving spouse named Vic, his partner of 17 years, there will be a blank space. And those two examples are just emblematic of the inferior status that restricting same-sex marriage results in and has a very real impact. And we've named numerous examples in the brief. There are numerous examples below of the types of economic deprivation and stigmatizing differentiations that my clients suffer. And Counselor, in connection with that, and you may have heard this question asked already this morning. It's been a long morning. Yes. Would it be legally inconsistent, a conclusion that Texas should recognize same-sex marriages from other states, but at the same time a conclusion that Texas was perfectly free to ban same-sex marriage in Texas? Would those two conclusions be legally inconsistent? I believe those are legally inconsistent, as they would have been legally inconsistent in Loving v. Virginia, which was a case where it involved recognition of a marriage that had taken place in another state. The Court didn't distinguish between the right to have a recognition of your marriage. As regards your plaintiffs, it's an everybody wins or nobody wins. It's everybody wins, Your Honor. Don't you think it's, I mean, you've mentioned Loving, and it's perfectly legitimate that you've mentioned Loving, but don't you find it striking that only four or five years after Loving, the Court took the action it did in Baker v. Nelson? Well, Baker v. Nelson, and I'm glad you raised that, Your Honor, Baker v. Nelson found that there was not a substantial federal question, and it's been addressed numerous times. I would just add to that discussion, the fact is it's been discussed, as Judge Posner said, that was 42 years ago, 43 years ago. But that wasn't my question. I mean, you're certainly entitled to go into that, and it's a legitimate line of argument that you make on that. But you mentioned Loving. Yes, Your Honor. And then very, very shortly after Loving, in the wake of Loving, the Court decided what it did in Baker v. Nelson, upholding an absolute, strong, categorical ruling by the Minnesota Supreme Court that said that there's no constitutional protection for same-sex marriage. So to the extent that Loving made the distinction for discrimination or distinction based on race, it didn't make that distinction when it had the very quick opportunity after Loving when it decided Baker. Well, Your Honor, as was noted earlier, Baker was decided at a time when homosexual conduct was actually illegal. It was decided not only before Lawrence but before Bauer v. Hardwick. And as the Court recently observed in 2010 in Christian Legal Society v. Martinez, the decisions of the Court have failed to distinguish between status and conduct. And it actually noted that when homosexual conduct is made criminal by the law of the state, that declaration in and of itself is an invitation to subject homosexual persons to discrimination. And in that, I would suggest that prior to, and this is a long time ago, the time of Baker v. Nelson, there was criminalized conduct and it was a different world and it's changed now. And it was a different circumstance. The Minnesota Supreme Court never mentioned the criminalization factor. They only addressed whether it was a violation of any of the several amendments that were being asserted. Well, I would say, Your Honor, that I would agree with counsel previously who observed that you can be blinded by your age, blind by the age that you're in, and that views do evolve, and that was expressly recognized in Windsor, that artifacts from a previous time which may have seemed at that time acceptable over time become unacceptable. That was as Judge Posner said. You do acknowledge that that was, at least immediately after it was issued, that was binding precedent on the specific question that we're addressing, that you're addressing today. Until it was wholly undermined by subsequent doctrinal developments, I agree with you, Your Honor. Well, there has been no other Supreme Court case even nearly on point on that specific question, which was whether it's constitutional for a state to limit marriages to heterosexual couples. So under Rodriguez v. Shearson, the court will let us know when it's changed its mind on this. I would suggest that in Perry, it was considered and denied on standing. That case was decided on standing, not on lack of a substantial federal question, and there was an issue, specifically an issue, relating to restrictions on same-sex marriage within a state. I can't add much more than what's already been stated. I will say that five circuit court decisions and something like 25 district court decisions have found that the subsequent doctrinal developments have undermined the applicability and force. And I'll just note that all this talk about Baker in the 1970s is making me nostalgic for my Afro and my 8-track tapes. Now, Your Honor, the state of Texas has now responded to our challenge, saying that these laws are not about depriving homosexuals of rights at all. They're about channeling opposite-sex couples who are capable of childbearing into responsible procreation, even though, as counsel said moments ago, that restriction actually doesn't promote that end. It doesn't stop births to single parents. But in any event, what you heard, that definition of marriage from this lectern, it's an incredibly narrow, blinkered view of marriage that would be unrecognizable, really, to anyone who's experienced it, witnessed it, or aspires to it. And it's amazing, really, it's quite amazing, because one of the consistent accusations has been to us, in our case, and others like us, is that we are attempting to redefine marriage. And I have never seen as radical a redefinition of marriage as I heard at this lectern in the papers of the state of Texas. And I assure you that that radical redefinition of marriage is not present in the legislative record anywhere. Now, in the district court, the state asserted more broadly that the statute, the restriction that we're challenging, was intended to promote, well, for the purposes of responsible procreation and childrearing. But they've walked that back on appeal, because the reality is they couldn't answer the question, if marriage is good for children, why deny marriage to same-sex couples with children? The reality is that this law depriving same-sex couples of the right to marry is not intended to modify or guide the behavior of opposite-sex couples at all. Everyone knows that this law is really about the moral disapproval of homosexuals. But since the Supreme Court has explicitly rejected that as a rationale that can support the law, counsel for the state has to come up here and attempt to redefine it with this somewhat, I would suggest, half-baked justification that narrows what actually marriage is, and attempts to redefine it and convince you that this is what the people of Texas believe marriage is. They also attempt to tell you that marriage is about subsidies, and this is about subsidies. And I invite a discussion of Plyler on that topic in a moment. But the fact that it's a subsidy rather than a restriction does not cloak it in immunity from challenge under the 14th Amendment. Unfortunately, the law's real effect is not only to harm the homosexuals, the gays and lesbians, who are not permitted to marry, but also the children they are raising, both children born to same-sex couples, children born to heterosexuals whom those same-sex couples end up raising. The Supreme Court in Windsor recognized this effect on children, and that's one reason why Judge Posner in the Seventh Circuit case said that at a deeper level, this type of challenge is about the welfare of American children. An amicus brief from Gary Gates suggests that there are 11,000 same-sex households raising 19,000 children in the state of Texas. And beyond that, there are 600,000 adults who fall into this stigmatizing restriction, and 93,000 of those are in acknowledged same-sex relationships. This notion that we should wait and see and evolve and that someday perhaps they will have the right to marry is galling. In the long run, as Keynes observed, we're all dead. But the reality is that my clients live every day under the cloud of a stigma. They're not permitted to have access to marriage. And some of them die before they're allowed to do that, and some of them will until this court acts. Now, for equal protection purposes, the state argues that the same-sex prohibition should be judged according to the most lenient standard, one used for judging economic regulations. Let's discuss that. Beach Communication set forth that standard that a statutory classification can be upheld against challenge if there's a reasonably conceivable set of facts that could provide a rational basis for it. But it also went on to say that that statutory classification has to be one that neither proceeds along suspect lines nor infringes fundamental constitutional rights. Now, in Baskin, Judge Posner observed that he thought that this was exactly the sort of classification that would fall into the rubric of along suspect lines. But let's consider for a moment the actual way in which that test has been applied here in this circuit. St. Joseph Abbey case was mentioned, a recent case involving a rational basis test. A unanimous panel considered an equal protection challenge to a state regulation requiring that caskets be sold by funeral directors. Obviously, no more like this case than the Beach Communications case. It's an economic regulation case. But the court made clear that in the Fifth Circuit, the Fifth Circuit will not merely rubber stamp just any asserted rational basis for statutory restriction. A hypothetical rationale, even post hoc, cannot be fantasy. That's a direct quote. And the court will actually examine whether the chosen means rationally relate to the state interest that it articulates. Well, we've already heard that the chosen means of restricting same-sex marriage do not, the state concede, rationally relate to one of the state interests that he suggests it promotes. Now, the court will also examine the rationale informed, quote, informed by the setting and history of the challenge rule. The challenge law will not survive if there's no rational relationship, if it doesn't exist, between the restriction, in that case it was restricting who could sell caskets, and the articulated state interest. And there were several, and the court found that there was no connection. But let's do what in that most simple rational basis case asks us to do, St. Joseph Abbey. Let's look at the setting and the history of the restriction. The setting and the history, in 1973, Texas first expressly limited marriage to opposite-sex couples after several same-sex couples attempted to be wed. In fact, two men actually obtained a marriage certificate. The state ran in and defined marriage to only be between a man and woman, and it was clearly intended, this history suggests, not to protect opposite-sex couples and channel their behavior, but to prohibit homosexuals from marrying. Texas, again, later limited marriage to opposite-sex couples by statute in 2003, and then by amendment in 2005. And these measures were in response, and it was noted at the time in the record, and it's before the court, they were in response to a same-sex marriage case in Massachusetts where it was asserted there was a state right under the Constitution, the state Constitution. In that case, again, it was in response not to protecting or channeling or these sorts of arguments you've heard. The setting and the history make clear that it was in response to denying same-sex couples access to marriage when they wanted it. It also, the amendment and that statute, departed from prior, an unusual departure from prior law, in which it removed recognition of a broad class of marriages duly executed by other states, that is, same-sex marriage. It explicitly said we will not recognize that, something Texas had not done before. Now, the history and background of these measures exposes the state's rationale as the sort of post hoc hypothetical fantasy that the court rejected in St. Joseph Abbey. There's no evidence that the state passed the measures that are challenged here and that were struck down by Judge Garcia to channel opposite-sex couples into marriage for purpose of procreation. You don't need contemporary evidence. It's whatever an inventive lawyer as able as you have sitting over here can come up with. I mean, that's the law. That is actually but what this court said in St. Joseph Abbey, which I know Your Honor is familiar with, is that you wouldn't merely accept any asserted rationale. You'll look at the setting and the history, and then you'll examine whether the chosen means rationally relate to the state interest, and that's the next thing you have to do. And the merest examination exposes that the purported justification is ludicrous, and you heard in argument restricting same-sex couples as was done does not, for instance, discourage out-of-wedlock childbirth. Council acknowledged that. The rationale that he puts forth, that the state puts forth, is that because many opposite-sex couples will procreate even though many won't or can't or can only do so with some intervention of some kind, the law will prohibit all same-sex couples from marrying even though many will procreate, like our clients, or adopt children, like many others. The state simply can't explain why prohibiting same-sex couples, that restriction for marrying, will somehow encourage opposite-sex couples, who otherwise wouldn't do so, to procreate within marriage or marry before procreating. There's a disconnect. And so even under the simplest standard, you have to say, and I believe it was discussed earlier, the notion that, well, the state does have to be a perfect fit. There can be an imperfect fit. But when you have a law that's both under-inclusive and over-inclusive, it might suggest that that's a case where it's not a matter of an imperfect fit but no fit at all, I believe, as Your Honor observed. That was all addressed in Minnesota in Baker v. Nelson. There was a discussion in that opinion, as you know, about the fact that some elderly couples, for example, can't procreate, but the court discounted that because you don't have to have a perfect fit. And the Supreme Court said that that did not raise a substantial federal question. Well, in 1972, there was a case in which the plaintiffs sought a right, recognition of a right for same-sex couples to be married at a time when any intimate sexual relationship between same-sex couples was a criminal act. A matter of completeness, Minnesota at the time had no law for or against same-sex. I don't think it occurred to anybody. And the application was made to a clerk of the court, and not by a decision by some legislature and through all political processes, that I'd never seen one of these things before, which is because this was a very new phenomenon, and said no. And then it went up at the same time when it made practical common sense, because how do you issue a marriage license to someone to go commit a criminal act? I think that history in that context is— It doesn't really answer the question of Baker, but it does put it a little more in perspective, I think, to keep in mind exactly what was going on in Minnesota. Well, the history and the context is certainly instructive, Your Honor. I would agree. Again, the point of the question I asked you was that, irrespective of the criminal aspect of it, which was never mentioned in that Supreme Court opinion, the court specifically addressed the imperfect fit of authorizing marriages by those who, for whatever physical reason, cannot or will not procreate. The court addressed that as part of the analysis and said that that's not an issue. That's not a problem. Your Honor, as I believe has been addressed before, I completely agree that that is what the court did in 1972. I would suggest that that decision, the summary dismissal in that regard, for lack of a substantial federal question, has been undermined by subsequent doctrinal developments. But in any event, so I would suggest that under the most forgiving rational basis standard, this restriction must fail when challenged. But we don't really have— If it doesn't, I think the courts has to consider the line of cases, Claiborne, Moreno, Plyler, Romer, Windsor. They're all cases that involve rational basis tests being applied, but it's been discussed. Was it the same rational basis test? The laws of this kind that were challenged in the context raised the inevitable inference that there was a disadvantage imposed or born of animosity towards the people who are the subject of those statutes. In this case, what occurs when we see these circumstances is that a more searching form of review is required when the rights of an unpopular minority group, whether it's undocumented aliens or whether it's homosexuals, when their rights are at stake. That was Justice O'Connor's description in her concurrence in Lawrence, and she was echoing the language of Carolyn Products' footnote number four. We don't have to generalize to that extent, though, that specifically the court has taken that kind of review, which I would call a more searching form of review. In Windsor, it's referred to as a more careful form of review. It's called rational basis with a bite in some quarters, if that's preferred. But it definitely takes into account the context. Now, for instance, in Rome or the state of Colorado specifically excluded homosexuals from the benefit of anti-discrimination laws. And the court said that laws of this kind raise the inevitable inference that the disadvantage imposed was born of animosity. It applied a form of rational basis to ensure that classifications are not drawn for the purpose of disadvantaging homosexuals in that case. In Windsor, the court, as we know, did not specify the specific level of review, but it noted that there was a discrimination of an unusual character, and that required careful consideration. And there the court found that were DOMA-deprived same-sex couples at the benefits and responsibilities of federal benefits, it was strong evidence of a law having the purpose and effect of disapproval of homosexuals. And although the court didn't provide a label for its review, it struck down the law upon careful consideration, and that's what should occur here as well. Well, there's similarly strong evidence here. Now, I want to discuss the heightened scrutiny factors. In particular, in its briefing and below, the state never challenged, and let me just say, in the event that somehow this restriction could survive rational basis review or rational basis with a bite review or whatever careful scrutiny, whatever you want to call it, the court should consider the heightened scrutiny factors specifically. You referred properly to the reference in Windsor to discriminations of an unusual character. Yes. But as you know, that sentence immediately followed the sentence that said that DOMA departs from this history and tradition of reliance on state law to define marriage. But you have to take those two sentences together because they're adjacent in the opinion. Well, I would say, Your Honor, that certainly that departure and that circumstance required the court to give that careful consideration, but that's not the only circumstance that would require careful consideration, and there's a long line of cases, of other cases that have it, and in this kind. But you surely can't assert that discrimination against same-sex marriage was of an unusual character. In fact, throughout the world, it was pretty well predominant or, if not, exclusive. So what the court's referring to here, discrimination of an unusual character, is what the Congress had done in enacting DOMA in light of the history and tradition of reliance on state law to define marriage. Well, certainly a couple of things about that. One thing the state did in Texas, completely withdraw recognition of valid legal marriages in other states in a way that it had never done before, and that's certainly a departure. Secondly, the refusal to recognize… Yes, that in Texas, they didn't need to. In fact, they saw a cloud on the horizon, and wise or unwise, however one wants to see that, that's what they were responding to. Yes, well, Your Honor, I think what, if you look at Windsor and its import, and I know there's been some questions as to its opinions applicability, I would say its reasoning certainly is something that is instructive. But if you look at what the court saw in the same occurring, Plyler, Claiborne, Moreno, is the court sees circumstances that lead it to believe in those circumstances that an unpopular minority is being subject to a restriction of some kind, a disadvantage of some kind, and therefore undertakes this careful searching scrutiny. And in that circumstance, the court struck down the restriction. Now, the heightened scrutiny factors include, I think, the state addressed specifically immutability, which was a bit of a surprise. It hadn't challenged it below as a factor requiring heightened scrutiny. But I want to make clear that on immutability, the question is whether or not the person who's subject to the restriction has to change in order not to be discriminated against. And that was Judge Jacob's formulation in Windsor that was ultimately affirmed. In their briefing and below, the only issue, the only factor that the state of Texas addressed was political power, whether gays and lesbians had sufficient political power to protect themselves. But in the first— Do you think this movement would be better off without any judicial involvement? Well, Your Honor, I represent individuals who actually, I believe, have a present constitutional right to relief. And I don't represent a movement. I understand that. But when Justice Ginsburg was pressing the gender as a suspect criteria, she came very close. But she came—she failed that because Justice Powell looked at the ERA and said, well, the clinical process has taken care of this and let it go. And then, of course, it turned out that the ERA was not enacted, and so she did not achieve that. I think that's a fair description of what happened. I think there have been numerous discussions in terms of what it means to let this right or these issues percolate. Some of them are that the Supreme Court should not step in before the lower courts. This has moved so fast. I just wondered if— Your Honor, the quickness of the movement, so to speak, does not bear on whether my clients have a present constitutional right. They are discriminated against. They are not treated the same as their fellow citizens. It does bear—I can debate that to you, but it does bear on timing. And that's just always been there. Well, I— When do you—when do you challenge Plessy? When do you take that? That was a great fear for years in Incfon, the fear that that decision would go there too quickly. And it was a great reluctance. You remember that history. Your Honor, I feel certain that had the Court not overturned Plessy that it might very well be good law and the ills that were sought to be redressed in the state of Texas might still be present. I was suggesting to you there is a lot of discussion out there and has been for a long time among political theorists and whatever as to what the consequences on these movements that seem to be moving on their own to judicial intervention. Let me say in the context of another great struggle, and that was the struggle of civil rights, there were great discussions as to when certain lines of cases should be brought. But there was an absolute certainty that their clients had a constitutional right to equal protection. And the only question was a matter—was a question of strategy, not of right. And if there is a right, I don't believe anyone who is involved in those discussions would have said, let's wait some day. We don't have a right now. Our right will evolve. They had a present right, and the question was a matter of strategy. Now, from our perspective— It's not within my compass, so I don't want to comment. It's just that we're talking about a political process that's out there. And there is that concern, and I'm sure—I don't know the answer to it. It's not my decision. We're here to make a decision, and we will, perhaps. I rather suspect that the junior varsity is not going to get on the field. Well, Your Honor, I would join with the State of Texas in urging you to decide this case, even if today the conference results in granting review of other cases, because my clients have a present interest and need to have their rights vindicated and to be treated like all of their fellow citizens who are permitted access to marriage. Thank you, Mr. Lane. Mr. Mitchell, you've set time for your vote. If I could begin where I left off with my opening argument on the issue of animus. And even if the plaintiffs could somehow prove that the recent enactments were motivated by animus, they still cannot prevail because they need further to show that the common law background definition of marriage, which predates these enactments and has existed since time immemorial, was also motivated by animus, and they do not try to make that showing, and they cannot make the showing. The reason for that background understanding of marriage as a union between a man and a woman was rooted not in animus, but in the biological reality that only opposite-sex couples are capable of producing new children. Judge Higginbotham was also asking about the state's rationale for its marriage laws on rational basis review and asking whether the withholding of subsidy rationale was the sole basis on which we were relying. Now, it's the only basis we need to show to prevail on rational basis review, but it's not the only ground on which we are relying. And if I could make a request of Your Honor respectfully, I would ask that you please read the two statements cited on page 16 of our opening brief, ones from the Witherspoon Institute, ones from the Institute for American Values. These are statements by distinguished scholars of marriage law explaining why the recognition of same-sex marriage might have other unanticipated effects. And at this point in time, there's no reliable empirical data by which to judge this question, and that's why rational basis review allows a state to rely on rational speculation unsupported by empirical data, and we have provided that. We have not only provided rational speculation for the distinction between same-sex and opposite-sex couples, but we've provided in our brief rational reasons for why one might believe that a state should proceed with caution before recognizing same-sex marriage and why one might believe that recognition of same-sex marriage could not only fail to advance but perhaps even undermine the state's interest in procreation. That's really not our prerogative. The Supreme Court has the power to decide when to decide, and that may be the most powerful weapon it has in its arsenal to decide when to decide, and it will do that. But clearly right now they have not decided. This is a little more than just an empty discussion on that point. None of us have control over that. We're here to do what we've got to do. But at this time, the appellate court is bound by the Supreme Court's decisions, and the reason our state marriage laws must be upheld ultimately comes down to two simple reasons. First, nothing in Texas's marriage laws conflicts with any holding of the Supreme Court. Indeed, there's no dispute on that. As Judge Smith pointed out, the holding of Windsor was carefully limited to the decision that invalidated the Federal Defense of Marriage Act, and the justices were careful not to express any opinion on the constitutionality of state opposite-sex marriage laws. There's no conflict between Texas's laws and any holding of the Supreme Court. Second, Texas's marriage laws do not contradict any language in the Constitution. Equal protection of the laws does not require a state to confer equal treatment on things that are different, and the differences between same-sex and opposite-sex couples are rooted in biological reality. Now, to be sure, the plaintiffs think that same-sex couples should be treated the same as opposite-sex couples, notwithstanding this difference, but that is a value judgment, and it does not establish a denial of equal protection. The Fourteenth Amendment does not say that states must confer equal treatment on whatever federal judges think should be treated equally. So a state law cannot be declared unconstitutional, absent a conflict with either a holding of the Supreme Court or absent a conflict with actual text in the Constitution. Not only have the plaintiffs not shown such a conflict, they have not even argued that such a conflict exists. And that is why, in the end, the Court must uphold the state's marriage laws no matter how much a judge may disagree with them as a matter of policy. If the Court has further questions, I'm happy to answer them. Otherwise, I'll yield my time back to the Court. Thank you, Judge. All right. Thank you, Mr. Mitchell. Your case and all three of today's cases are under submission. I want to particularly thank our Court staff, Lyle Casey, our clerk of court, and his staff, and all of the others who have assisted and gone to really extraordinary efforts to make today's hearings run smoothly. And I thank everyone here also for your cooperation in that. And the Court is in recess under the usual order.